UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
NORMA KNOPF and MICHAEL KNOPF,         :        16cv6601(DLC)
                                       :
                 Plaintiffs,           :        OPINION AND ORDER
                                       :
         -v-                           :
                                       :
MICHAEL PHILLIPS, PURSUIT HOLDINGS,    :
LLC., and MICHAEL H. SANFORD,          :
                                       :
                 Defendants.           :
                                       :
-------------------------------------- X

APPEARANCES:

For Norma Knopf and Michael Knopf:
Eric W. Berry
Berry Law PLLC
745 Fifth Avenue, 5th Floor
New York, NY 10151

For Michael Phillips:
Lorraine Nadel
Adam Hanan
Nadel & Ciarlo P.C.
3 East 54th Street, 16th Floor
New York, NY 10022

For Michael H. Sanford:
Michael H. Sanford
23 McKinley Road
Montauk, NY 11954

DENISE COTE, District Judge:

     This is one of three actions before this Court arising from

a loan repayment dispute between plaintiffs Norma and Michael

Knopf (collectively, the "Knopfs") and pro se defendant Michael

Sanford ("Sanford") and his company, Pursuit Holdings, LLC

("Pursuit"). In this action, the Knopfs also bring claims against defendant Michael Phillips ("Phillips") for his purchase of residential property located at 44 East 67th Street ("PHC") from Pursuit. Phillips moves for summary judgment on the sole remaining claim against him, a claim of actual and constructive fraudulent conveyance brought under the New York Debtor and Creditor Law ("DCL"). The Knopfs move for summary judgment on their breach of fiduciary duty and alter ego claims against Sanford and on their allegations of Pursuit's insolvency "at all relevant times" to this litigation. For the following reasons, Phillips' motion is granted and the Knopfs' motion is granted in part.

## Background

The history of this litigation is described in several prior Opinions, with which familiarity is assumed. See Knopf v. Esposito, 17cv5833(DLC), 2017 WL 6210851 (S.D.N.Y. Dec. 7, 2017); Knopf v. Meister, Seelig & Fein, LLP, 15cv5090(DLC), 2017 WL 1449511 (S.D.N.Y. Apr. 21, 2017); Knopf v. Phillips, 16cv6601(DLC), 2016 WL 7192102 (S.D.N.Y. Dec. 12, 2016); Knopf v. Meister, Seelig & Fein, LLP, 15cv5090(DLC), 2016 WL 1166368 (S.D.N.Y. Mar. 22, 2016); Knopf v. Meister, Seelig & Fein, LLP,

15cv5090(DLC), 2015 WL 6116926 (S.D.N.Y. Oct. 16, 2015).[1]  This

Opinion recites only those facts relevant to the instant

motions.  The following facts are undisputed unless otherwise

noted.

**A.  The Knopfs' Loans to Sanford and Pursuit**

The Knopfs and Sanford had a business relationship before

the Knopfs extended the loans which are at issue in this action.

In 2000, Michael Knopf, through his IRA, and the Knopfs'

company, Delphi Capital Management LLC ("Delphi"), invested in

Sanford's hedge fund ("Hedge Fund").  Delphi and Michael I.

Knopf IRA were limited partners in the Hedge Fund.[2]  Sanford

controlled the Hedge Fund's general partner.[3]  The Hedge Fund was

organized as a Delaware limited partnership.

The loans from which this litigation arises were made in

2006, when the Knopfs made two loans to Sanford and Pursuit for

---

[1]  Of the three actions involving the Knopfs and Sanford before
this Court, this action is the only one that is active.  On
December 7, 2017, Knopf v. Esposito was dismissed with
prejudice.  On April 21, 2017, Meister, Seelig & Fein's motion
for summary judgment on the sole remaining claim against them
was granted and the case was closed in October 2017.

[2]  Under a November 2000 investment agreement between Delphi and
the Hedge Fund's general partner, Delphi's limited partnership
interest extended to Delphi's "affiliates or controlled
entities."

[3]  At that time, the Hedge Fund was called UIM Voyager Fund, L.P.
It appears to now be known as Sanford Partners Voyager Fund,
L.P.

3

the purpose of purchasing residential real estate located in Manhattan, New York.  The first loan was for $1,690,860, which Pursuit used to purchase PHC.  This loan was funded with funds withdrawn from holdings in the Hedge Fund.[4]  The purchase price was $2,050,000.  Pursuit closed on the purchase of PHC on January 31, 2006.

On February 9, 2006, Sanford acknowledged the loan in a signed email to Michael Knopf:

> As requested, I hereby acknowledge receipt of $1,690,860.00 from Michael and Norma Knopf (and/or from Delphi Capital Management LLC, or other entity which you may designate) <u>which was loaned to Michael Hayden Sanford and Pursuit Holdings LLC</u> on January 31, 2006 so that Pursuit Holdings could complete its purchase of condominium unit Penthouse C at 44 East 67th Street, New York, NY 10021.

> As it is understood between you and I, Pursuit will execute an agreement evidencing this interest only loan, which will be for a duration of not more than 24 months from inception, and the interest rate for the first 12 months will be at 9% per annum.  The entire loan, or any portion of it, may be repaid without penalty at any time.  <u>Pursuit will provide you with a mortgage on Penthouse C</u> and, if you wish, I will provide the additional collateral of my property in Rhinebeck, New York, known as the "Wyndclyffe castle." If you require that the mortgage on Penthouse C be recorded in NYC, I will be responsible for paying 50% of this expense.

---

[4]  Although Sanford appears to dispute that these funds came from the Hedge Fund, a document submitted in connection with these motions describes the disbursement history of the Hedge Fund to Delphi and Michael I. Knopf IRA and indicates that on January 27, 2006, $1.7 million was transferred from the Hedge Fund to an account controlled by Norma Knopf.

> I guarantee that until which time you and I execute agreements with respect to the loan for Penthouse C, I will not offer for sale, mortgage, hypothecate or otherwise encumber Penthouse C.
>
> . . .
>
> I understand that your attorney may require that I execute a more formal representation as to our understandings and or may have already completed a loan agreement for me to sign. I will cooperate with you in any way to provide the peace of mind you need so that you know your loan principal is properly protected.

(Emphasis supplied.)

The second loan was for $3,250,000, which Pursuit used to purchase three condominiums located at 10 Bedford Street (the "Townhouse," with PHC, the "Properties"). An agreement between Sanford and the Knopfs executed on May 30, 2006 and "dated May 31, 2006" provided:

> Michael Hayden Sanford ("Sanford") is hereby authorized by Michael I. Knopf, Norma Knopf and Delphi Capital Management, LLC (collectively "Knopf") to withdraw $3,250,000 from Knopf's limited partnership interests in the Sanford Partners Voyager Fund, LP on or about May 30, 2006 so that Sanford may complete its purchase of 3 condominium units located at 10 Bedford Street, New York, NY through Pursuit Holdings LLC, a Delaware incorporated single member LLC established and fully owned by Sanford.
>
> . . .
>
> It is anticipated that Sanford and Knopf will execute a long form document memorializing both the $1,690,860 loan and the $3,250,000 loan. Until which time such agreement is executed by both parties, Sanford shall not sell, hypothecate or otherwise encumber the real property he owns at either 44 East 67th Street or 10

> Bedford Street without the express written permission
> of Knopf.

(Emphasis supplied.)  On May 30, 2006, Sanford and the Knopfs

executed a second agreement granting the Knopfs and Delphi a 20%

interest in the net profits of the Hedge Fund.  Pursuit closed

on the Townhouse in June 2006.

## B.  The Sale of PHC

In 2009, the Knopfs sued Sanford and Pursuit in the Supreme

Court of the State of New York, New York County (the "State

Court Action") for repayment of the loans.  The complaint

asserted claims for breach of contract and breach of fiduciary

duty and sought the imposition of a constructive trust on the

Properties.  At the outset of the litigation, the Knopfs filed

notices of pendency against the Properties.  On October 15,

2013, the New York State Appellate Division ("Appellate

Division") extended the notices of pendency for a second three-

year term.  Knopf v. Sanford, 972 N.Y.S.2d 893 (1st Dep't 2013).

While the State Court Action was ongoing, PHC was marketed

for sale through public listings and advertisements with an

asking price between $2.7 and $3 million.  One listing for PHC

stated, "REDUCED BY $1 MILLION FOR QUICK SALE.  MUST BE SOLD BY

MONTH'S END."[5]

---

[5]  Sanford disputes that he instructed this advertisement to be
posted, indicating "[n]ot[h]ing was done in haste —- the online

In 2013, Phillips learned that PHC was being marketed for sale. At the time, Phillips was in the process of purchasing a different unit -- Apartment 11A -- in the same building as PHC. In July 2013, Phillips purchased Apartment 11A for $4,750,000. Phillips' spouse was unhappy with Apartment 11A and Phillips continued looking for another apartment.[6]

In May 2013, Phillips made an unsolicited offer to Sanford to purchase PHC for approximately $2.25 million. Phillips did not know Sanford prior to learning that PHC was being marketed for sale. In July 2013, Phillips made a second offer to Sanford to purchase PHC for approximately $2.8 million, which Sanford rejected. In December 2013, Phillips made a third offer to Sanford to purchase PHC for $2.9 million, which Sanford accepted.

On December 23, 2013, Phillips and Pursuit signed a contract for the sale of PHC for $2,900,000.[7] Phillips paid a down payment of $150,000 as a deposit on the sale, which was placed into escrow. Sanford disclosed to Phillips in 2013 that a notice of pendency had been placed against PHC by the Knopfs,

---

ad that [the Knopfs' counsel][sic] found is from a company I had never heard of. I did not hire them."

[6] Phillips did not move into Apartment 11A and later sold it.

[7] The December 23, 2013 contract submitted in connection with the instant motions is partially illegible.

and that he and Pursuit were actively seeking to vacate it.
Sanford also indicated that he intended to sell PHC to pay
attorneys to defend himself in litigation with the Knopfs.  In
response, Phillips told Sanford that he would not close on the
sale of PHC while a notice of pendency remained in place.

In March 2014, Sanford informed Phillips that he lacked
sufficient funds to pay for attorneys to vacate the notice of
pendency on PHC.  Phillips agreed to release $100,000 of the
$150,000 down payment to Sanford to enable him to engage
attorneys to vacate the notice of pendency.  In exchange,
Pursuit granted Phillips a mortgage against PHC in the amount of
$100,000.  In June 2014, Phillips released the remaining $50,000
of the down payment to Sanford and the mortgage was amended to
reflect that fact.

On December 11, 2014, the Appellate Division, reversing the
lower court, granted summary judgment in favor of the Knopfs on
their breach of contract claims.  Knopf v. Sanford, 1 N.Y.S.3d
18 (1st Dep't 2014).  The Appellate Division also held that the
Knopfs had failed to establish their entitlement to summary
judgment on their constructive trust claim because they had not
made an evidentiary showing that money damages would be
inadequate.  Id.  The Appellate Division, however, did not
assess damages.  The Knopfs have not obtained a final judgment.

On December 23, 2014, New York County Supreme Court Justice Milton Tingling issued an order cancelling the notices of pendency. On or around April 15, 2015, Phillips and Pursuit executed an agreement that revised the purchase price of PHC from $2.9 million to $3 million. On July 2, 2015, the Appellate Division affirmed the cancellation.[8]

Following the cancellation of the notices of pendency, the Knopfs took a variety of actions aimed at preventing the sale of PHC. In connection with this activity, on October 22, 2015, an Appellate Division Justice issued an order that permitted the sale of PHC but required the proceeds to be placed in escrow ("October 2015 Order"). The October 2015 Order reads in relevant part: "1 bedroom property may be sold -- proceeds to be placed in escrow pending further court order." Subsequent orders issued by the Appellate Division in late 2015 lifted any restraints placed on the sale of PHC, including the escrow requirement imposed by the October 2015 Order. See Knopf v. Esposito, 2017 WL 6210851.

In late 2015, Phillips agreed to advance Sanford an additional $400,000 in purchase money to enable him to pay his attorneys and agreed to accept another mortgage on PHC for that

---

[8]  The Appellate Division's July 2, 2015 decision was vacated and substituted on October 6, 2015. See Knopf v. Sanford, 17 N.Y.S.3d 674 (1st Dep't. 2015); Knopf v. Sanford, 13 N.Y.S.3d 365 (1st Dep't. 2015). The October 6, 2015 decision again affirmed the cancellation of the notices of pendency.

same amount.  This mortgage was not recorded but was satisfied at the closing of the sale of PHC.

Phillips' and Sanford's relationship soured at times during this period.  In a November 10, 2015 email, Sanford indicated that Phillips was "a pathological liar and beyond unstable." That day, Phillips responded:

> I will take this email as a notice you will seek
> financing elsewhere.  I am truly sorry you are in this
> spot, but I cannot continue to fund your legal costs
> with knop[f] it has just broken me.  You are correct
> that I do not have anything or own anything in nyc and
> the money was borrowed.  I am going to return the
> balance to jamestown and pay off what I am short out
> of my earnings [].  I truly do hope you prevail in
> your pursuits, and will think good thoughts on your
> behalf.

On February 1, 2016, Phillips and Pursuit closed on the sale of PHC at a price of $3 million.  None of the proceeds of that sale were placed in escrow.

On February 8, 2016, Judicial Hearing Officer Ira Gammerman issued a report finding that the Knopfs were entitled to damages against Sanford in the State Court Action in the amount of $10,937,850, and that Pursuit was jointly liable for $8,336,488 of that amount.  The report has not yet been confirmed.

## C.  Post-Sale Litigation

On February 25, 2016, the Knopfs obtained an interim order from an Appellate Division Justice requiring any proceeds remaining from the sale of PHC to be placed in escrow.  Pursuit

and Sanford have since paid $436,227.32 of the sale proceeds into an escrow account. On March 24, 2016, the Appellate Division issued a preliminary injunction against any further dissipation of the real estate assets that Pursuit had acquired with loans from the Knopfs. Knopf v. Sanford, 26 N.Y.S.3d 866 (1st Dep't. 2016).

In June 2017, the Knopfs, Sanford, Pursuit, and other Sanford-related entities entered into a consent order in the State Court Action in which the parties agreed that "[n]o party hereto shall further contend that any other party hereto has heretofore acted in contempt of any court order in connection with this action." This resolved any claim by the Knopfs in the State Court Action that the February 1, 2016 sale of PHC to Phillips had been in contempt of a state court order.

**D. This Federal Lawsuit**

The Knopfs filed this action on August 22, 2016 against Phillips and Pursuit. They filed the first amended complaint against the same parties on September 6. At a conference held on September 15, Sanford requested that he be added to the litigation as a necessary party. Sanford indicated that he owned "one hundred percent" of Pursuit and asked the Court to allow him to participate in the case because "Pursuit's assets are the same as [his]."

On September 26, the Knopfs filed the second amended complaint ("SAC") and added Sanford as a defendant. In the SAC, the Knopfs allege that Phillips tortiously interfered with their contracts with Pursuit and Sanford. The Knopfs also allege that the sale of PHC constitutes a fraudulent conveyance and assert claims against Phillips and Pursuit for actual and constructive fraudulent conveyance under the DCL. Finally, the Knopfs assert claims against Sanford for breach of fiduciary duty, alter ego liability, and for the imposition of a constructive trust on Sanford's membership interest in Pursuit. Phillips and Sanford each filed motions to dismiss the SAC. A default was entered against Pursuit on December 2. On December 12, the Court dismissed the Knopfs' claim for tortious interference with contract against Phillips and permitted all other claims to proceed. Knopf v. Phillips, 2016 WL 7192102.

Phillips answered the SAC on January 5, 2017, and filed a cross-claim against Pursuit and Sanford for recovery on a theory of common law indemnification. Phillips asserts fifteen affirmative defenses in his answer, including that he paid "fair consideration, fair market value, and/or reasonably equivalent value" to Pursuit for the purchase of PHC and acted in good faith. He also asserts as an affirmative defense, "[t]o the extent the plaintiffs are able to establish that the transfer of title of PHC from Pursuit to Phillips is a fraudulent

12

conveyance, the plaintiffs would then only be entitled to a money judgment against Phillips in the amount of the equivalent value of PHC that Phillips failed to convey to Pursuit in exchange for PHC." Sanford answered the SAC on January 9, and asserted seventeen affirmative defenses, including "fraud," "fraudulent concealment," and "negligent misrepresentations."

On September 21, the Knopfs filed a motion for judgment on the pleadings dismissing Sanford's fraud-related second, third, and sixteenth affirmative defenses, described above, under Federal Rules of Civil Procedure 12(c) and 9(b). The motion became fully submitted on November 2, and is addressed below.

Following the close of discovery, summary judgment motions were filed. On October 16, Phillips moved for summary judgment on the remaining fraudulent conveyance claim against him. On October 17, the Knopfs moved for partial summary judgment on their breach of fiduciary duty and alter ego claims against Sanford and on their allegations of Pursuit's insolvency as described in paragraph 89 of the SAC, which is described below.[9] Sanford did not oppose the Knopfs' motion by November 10, as required by a scheduling order. On November 29, the Court granted Sanford's request for an extension to oppose the Knopfs' motion for partial summary judgment and ordered that any

---

[9] Phillips refiled his motion on October 25, and the Knopfs refiled their motion on October 26.

opposition be filed by December 4.  On December 5, the Court
granted Sanford a second extension to oppose the Knopfs' motion
and ordered that any opposition be filed by December 7.

By Opinion and Order of December 7, the Court dismissed
with prejudice a related case involving allegations that Sanford
conspired with some of his lawyers to obtain what the Knopfs
characterize as an ex parte advisory opinion from an Appellate
Division court attorney.  The Knopfs had asserted that the
advisory opinion permitted Pursuit to sell PHC without using the
proceeds of the sale to repay the Knopfs.  Knopf v. Esposito,
2017 WL 6210851.

Also on December 7, Sanford filed three affidavits in
opposition to the Knopfs' motion for partial summary judgment.
The first affidavit is signed by Sanford individually.  It
requests that the Knopfs' motion for partial summary judgment be
denied and attaches 10 excerpted and/or highlighted exhibits
without further explanation.  The second affidavit is signed by
Sanford individually and as the "authorized representative" of
Pursuit.  The second affidavit briefly opposes the Knopfs'
motion for partial summary judgment on the breach of fiduciary
duty and alter ego claims against him and attaches 20 exhibits.
The third affidavit is signed by Sanford individually and as the
"authorized representative" of Sanford Partners, LP, MH Sanford
& Co., LLC, and the Hedge Fund.  It includes a brief discussion

14

of events concerning Sanford's affirmative defenses described above, and attaches 18 exhibits.  The motions for summary judgment became fully submitted on December 14, 2017.

On December 15, Sanford filed a memorandum of law, a document styled as a "Fed. R. Civ. P. 56(c) statement and counterstatement of facts," and related material in opposition to the Knopfs' motion for partial summary judgment.  That day Sanford also filed a letter requesting that the Court consider these materials.  The Knopfs indicated on December 15 that they took no position on whether Sanford's materials should be considered.

## Discussion

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  See Eastman Kodak

Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015). "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted) (emphasis omitted).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is genuine and material

if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

## I.   Constructive Fraudulent Conveyance

The Knopfs assert that Pursuit's sale of PHC to Phillips was fraudulent and bring constructive fraudulent conveyance claims under the DCL against Phillips and Pursuit.  The relevant dates for the transaction are December 23, 2013, when Phillips signed a contract to purchase PHC for $2.9 million; April 15, 2015, when the contract was amended to reflect a purchase price of $3 million; and February 1, 2016, when Pursuit closed on the sale of PHC for $3 million.  There are disputed issues of fact regarding Pursuit's insolvency as of these dates.

There is also conflicting evidence regarding the value of PHC, although it is undisputed that Pursuit purchased PHC in an arms-length transaction.  On December 23, 2013, Phillips and Pursuit signed a contract for the sale of PHC at a price of $2.9 million.  PHC had been publicly advertised, and there is no evidence that any prospective buyer ever offered to pay more than $2.9 million for PHC.  Nonetheless, the Knopfs have submitted an expert report indicating that PHC's fair market value on December 23, 2013 was $3.45 million.  Phillips has submitted expert reports assessing PHC's value to be $2.8 million on December 23, 2013 and $2.3 million on February 1,

2016.[10]  The Knopfs have not submitted evidence of PHC's fair

market value on February 1, 2016.[11]

Phillips moves for summary judgment on the Knopfs' claim

that his purchase of PHC constituted a constructive fraudulent

conveyance in violation of the DCL.[12]  The Knopfs cross-move for

summary judgment on their allegation that Pursuit was insolvent

"at all relevant times" as described in Paragraph 89 of the

SAC.[13]

Under the DCL,

> a conveyance by a debtor is deemed constructively
> fraudulent if it is made without 'fair consideration,'
> and (inter alia) if one of the following conditions is

---

[10]  The report assessing PHC's value to be $2.8 million on
December 23, 2013 is largely illegible.

[11]  The Knopfs supply an October 16, 2017 declaration in which a
certified appraiser indicates that he prepared a report that
estimated the value of PHC as of February 1, 2016.  That report,
however, provides an appraisal of the value of PHC as of
December 23, 2013.

[12]  Phillips also moves for summary judgment "to the extent that
the [Knopfs] claim that Pursuit's granting of two mortgages to
Phillips are constructive fraudulent conveyances."  The SAC does
not allege that mortgages granted by Pursuit to Phillips
constituted fraudulent conveyances.  Nor do the Knopfs make this
argument in their briefs.

[13]  Paragraph 89 of the SAC states, "Pursuit was insolvent on
February 1, 2016, was insolvent throughout 2014 and 2015 and is
currently insolvent . . . ."  As a result, the Knopfs do not
allege Pursuit's insolvency as of December 23, 2013, when the
contract for PHC was signed.  In their memorandum in support of
their motion for summary judgment, however, the Knopfs argue
that Pursuit was insolvent on December 23, 2013 and submit
evidence in support of that position.

met: (i) the transferor is insolvent or will be
rendered insolvent by the transfer in question, DCL §
273; (ii) the transferor is engaged in or is about to
engage in a business transaction for which its
remaining property constitutes unreasonably small
capital, DCL § 274; or (iii) the transferor believes
that it will incur debt beyond its ability to pay, DCL
§ 275.

In re Sharp Int'l Corp., 403 F.3d 43, 53 (2d Cir. 2005)

(emphasis supplied).  The Knopfs have brought claims under all

three of these constructive fraudulent conveyance provisions, as

well as § 273-a, which covers conveyances by defendants in

actions for money damages who are subject to a final judgment.

As defined by the DCL, fair consideration is given for

property or an obligation:

(a) When in exchange for such property, or obligation,
as a fair equivalent therefor, and in good faith,
property is conveyed or an antecedent debt is
satisfied, or

(b) When such property, or obligation is received in
good faith to secure a present advance or antecedent
debt in amount not disproportionately small as
compared with the value of the property, or obligation
obtained.

N.Y. D.C.L. § 272.  For a conveyance to have been made for fair

consideration "(1) the recipient of the debtor's property must

either (a) convey property in exchange or (b) discharge an

antecedent debt in exchange; and (2) such exchange must be a

'fair equivalent' of the property received; and (3) such

exchange must be 'in good faith.'"  Sharp, 403 F.3d at 53

(citation omitted).  "[W]hat constitutes fair consideration

under section 272 must be determined upon the facts and circumstances of each particular case." United States v. McCombs, 30 F.3d 310, 326 (2d Cir. 1994) (citation omitted).

In general, the burden of proving a lack of fair consideration is upon the party challenging the conveyance. Joslin v. Lopez, 765 N.Y.S.2d 895, 897 (2d Dep't 2003). To demonstrate a lack of fair consideration, the claimant must show either a lack of "fair equivalent" value or a lack of good faith on the part of the transferee. In re Dreier LLP, 452 B.R. 391, 443 (Bankr. S.D.N.Y. 2011); see also In re Bernard L. Madoff Inv. Securities LLC, 458 B.R. 87, 110 (Bankr. S.D.N.Y. 2011). Fair consideration does not require dollar-for-dollar equivalence. In re LaForte, 2017 WL 1240198, at *5 (Bankr. E.D.N.Y. Mar. 30, 2017). Consideration can be fair so long as it is not "disproportionately small" as compared to the value of the transferred property. Id. (citation omitted).

A showing of bad faith requires more than the transferee's knowledge that the transferor is insolvent or that it wrongfully obtained the transferred property at the expense of other creditors. Boston Trading Grp., Inc. v. Burnazos, 835 F.2d 1504, 1512 (1st Cir. 1987).

> Whatever "good faith" may mean, however, we believe it does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies which the debtor obtained at the expense of other creditors.

> To find a lack of "good faith" where the transferee
> does not participate in, but only knows that the
> debtor created the other debt through some form of,
> dishonesty is to void the transaction because it
> amounts to a kind of 'preference' -- concededly a most
> undesirable kind of preference, one in which the
> claims of alternative creditors differ considerably in
> their moral worth, but a kind of preference
> nonetheless.

Id. (emphasis supplied). See Sharp, 403 F.3d at 54-55; In re

Bernard L. Madoff Inv. Sec., LLC, 440 B.R. 243, 265 (Bankr.

S.D.N.Y. 2010); In re Actrade Fin. Techs. Ltd., 337 B.R. 791,

805 (Bankr. S.D.N.Y. 2005).

Section 278 provides an affirmative defense to an otherwise

fraudulent conveyance.[14]  It states:

> 1. Where a conveyance or obligation is fraudulent as
> to a creditor, such creditor, when his claim has
> matured, may, as against any person except a purchaser
> for fair consideration without knowledge of the fraud
> at the time of the purchase, or one who has derived
> title immediately or mediately from such a purchaser,
>
> a. Have the conveyance set aside or obligation
> annulled to the extent necessary to satisfy his claim,
> or
>
> b. Disregard the conveyance and attach or levy
> execution upon the property conveyed.
>
> 2. A purchaser who without actual fraudulent intent
> has given less than a fair consideration for the
> conveyance or obligation, may retain the property or
> obligation as security for repayment.

---

[14]  The Knopfs assert that "this case presents a textbook
illustration of how the transferee's affirmative defenses
provided in Debtor and Creditor § 278 are applied."

N.Y. D.C.L. § 278 (emphasis supplied). Accordingly, under §
278(2), a purchaser who lacks actual fraudulent intent but who
gives less than fair consideration may retain the property as
security for repayment. Such a purchaser is only liable for any
difference between the value it conferred to the debtor and the
amount it received in exchange. In re CNB Intern., Inc., 440
B.R. 31, 42 (W.D.N.Y. 2010). Under § 278, the focus is on the
intent of the transferee, and the transferee bears the burden of
establishing the affirmative defense. Fed. Deposit Ins. Co. v.
Malin, 802 F.2d 12, 19 (2d Cir. 1986); In re Dreier, 452 B.R. 39
at 435.

### A. Bad Faith

Applying these legal principals to the summary judgment
motions at issue here, in order to demonstrate a lack of fair
consideration the Knopfs must demonstrate either that Phillips
failed to pay "fair equivalent" value for PHC or that he acted
in bad faith in purchasing PHC. Phillips is entitled to summary
judgment on the Knopfs' claim that Phillips acted in bad faith.
As described in Knopf v. Meister, Seeling & Fein, the Knopfs
have not presented any evidence of Phillips' participation in
the original dishonesty –- the allegedly fraudulent activity
associated with the loans that the Knopfs made in 2006 to
Sanford and Pursuit -- and do not even contend that Phillips was
involved in any way in those underlying transactions. 2017 WL

1449511, at *8.  It appears that Phillips' first interaction

with Sanford occurred in 2013 after learning that PHC was

available and being marketed for sale.  Under these

circumstances, the Knopfs' assertion of Phillips' bad faith

fails as a matter of law.

The Knopfs principally argue that Phillips acted in bad

faith when he "actively misled" the title agency in late 2015

and early 2016 about the status of the State Court Action.  They

assert that Phillips did not disclose Appellate Court orders,

including the October 2015 Order, which required that any

proceeds from the sale of PHC be placed into escrow "pending

further court order."  But, as described in Knopf v. Esposito,

any argument that a party to the sale of PHC violated a state

court order for proceeding with that sale and not placing the

proceeds in escrow on the day of the sale fails as a matter of

law.  2017 WL 6210851, at *6-8.  Moreover, as described above,

for purposes of DCL § 272, the lack of good faith refers here to

any showing that Phillips participated with Sanford in 2006 in

the allegedly wrongful use of the Knopfs' funds to purchase PHC.

See Boston Trading Grp., 835 F.2d at 1512; Knopf v. Meister,

Seeling & Fein, LLP, 2017 WL 1449511, at *8.  There is no such

showing.

## B. Fair Equivalent Value

Phillips is also entitled to summary judgment on any claim that he did not pay "fair equivalent" value for PHC.  PHC was advertised for sale on the open market.  In an arms-length transaction, Phillips agreed in December 2013 to pay close to the top of the range of the advertised price, his prior lower offers having been rejected.  No higher offer was ever received. PHC was ultimately sold for $3 million, which was nearly 50% more than the price at which Pursuit had purchased it in 2006. In those intervening years, the United States suffered a major economic crisis that affected the housing market and financial industry.

The Knopfs' expert report, which assesses the value of PHC to be $3.45 million on December 23, 2013, does not raise a material question of fact regarding the adequacy of the $3 million purchase price.  The report notes that PHC had been listed for sale on two separate occasions before 2013 and had not sold.  It was listed at a price of $3.7 million in May 2009, had its price reduced to $2.7 million in August 2009, and was delisted in September 2009.  The appraiser noted that the market for one and two-bedroom condominiums was "recovering" in 2013 from the financial crisis.  To assess PHC's market value as of December 2013, the expert conducted a "sales comparison," calculating the price per square foot of gross living area for

five properties he concluded were comparable.  Two properties
were located in the same building as PHC, but lacked the wrap-
around terrace that PHC has.  They were each in superior
condition when sold in 2012 for approximately $2,300 and $2,400
per square foot.  Two properties with wrap-around terraces, sold
in 2013 and 2014 for approximately $2,400 and $4,400 per square
foot, respectively.  The fifth comparable property, located on
the West Side of Manhattan, sold in 2013 for approximately
$3,600 per square foot.  PHC has 1,226 square feet in gross
living area.  A sales price of $3 million is equivalent to
approximately $2,400 per square foot.  This fits comfortably
within the range of the prices of the five condominiums that the
expert selected as his comparable units.  Even crediting the
Knopfs' $3.45 million appraisal of PHC, upon the facts and
circumstances of this case the $3 million paid by Phillips is
not "disproportionately small."  In re LaForte, 2017 WL 1240198,
at *5.

### C. Affirmative Defense under § 278(1)

Even if the Knopfs had established a prima facie case for
constructive fraudulent conveyance, Phillips has shown he is
entitled to summary judgment on his affirmative defense under §
278(1).  Phillips has demonstrated that, in purchasing PHC, he
lacked knowledge of the original fraudulent activity in the way
the law demands for a showing of bad faith, and conversely, for

a showing of good faith.  Phillips had no involvement whatsoever in the alleged underlying fraud through which Pursuit obtained PHC.  He executed a contract of sale in 2013 in an arms-length transaction and refused to proceed with the purchase so long as a notice of pendency remained in place.  While there are disputes regarding the fair market value of PHC, the $3 million that Phillips paid was well within a range of reasonable prices for the property and constitutes fair consideration as a matter of law.

The Knopfs argue that Phillips acted with knowledge of fraudulent activity based on his alleged attempts to mislead the title agency in late 2015 and early 2016 about the status of the State Court Action and because he allegedly knew that Sanford also intended to defraud the Knopfs by misrepresenting the status of the State Court Action to the title agency.  As previously described, any argument that a party to the sale of PHC violated a state court order by not placing all the proceeds of the sale into escrow fails as a matter of law.  Knopf v. Esposito, 2017 WL 6210851, at *6-8.  Accordingly, because the Knopfs have failed to offer sufficient evidence either to demonstrate that the sale of PHC lacked fair consideration or to raise a question of fact over whether Phillips acted with the relevant knowledge of fraudulent activity, Phillips' motion for

summary judgment on the Knopfs' claim for constructive

fraudulent conveyance is granted.[15]

## II.  Actual Fraudulent Conveyance

Phillips also moves for summary judgment on the Knopfs'

claim of actual fraudulent conveyance.  The SAC asserts a claim

of actual fraudulent conveyance against Phillips and Pursuit.

It contends that the sale of PHC to Phillips was made with

actual intent to defraud the Knopfs because "it was knowingly

accomplished, by both Pursuit and Phillips, with the specific

purpose of paying other creditors and alleged creditors of

Pursuit whose claims were subordinate to the lien of the Knopfs'

constructive trust claim, which is based on Pursuit's failure to

deliver the promised mortgage to them."

An actual fraudulent conveyance occurs if a conveyance is

made "with actual intent . . . to hinder, delay, or defraud

either present or future creditors."  N.Y. D.C.L. § 276.  "Where

actual intent to defraud creditors is proven, the conveyance

---

[15]  The Knopfs argue that an enforceable contract between
Phillips and Pursuit never existed because the contract signed
on December 23, 2013 included a provision indicating that the
contract would not be binding until executed by the purchaser,
seller, and escrow agent and that a contract signed by the
escrow agent has not been supplied.  The Knopfs further argue
that Phillips' statements in his November 10, 2015 email to
Sanford indicate that the contract was terminated "by mutual
agreement."  These eleventh-hour arguments are unavailing.  The
parties took numerous steps after December 23, 2013 indicating
their intent to be bound by the contract and closed on the sale
of PHC in 2016.

will be set aside regardless of the adequacy of consideration given." In re Sharp, 403 F.3d at 56 (citation omitted).

It is the intent of the transferor, here Pursuit, which is relevant to establishing a prima facie case of actual fraudulent conveyance. Id.; In re Dreier, 452 B.R. 39 at 435. Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, courts may look to "badges of fraud" surrounding the transaction -- "i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." In re Sharp, 403 F.3d at 56 (citation omitted). Badges of fraud include, inter alia: (1) a close relationship between the parties, (2) a questionable transfer not in the usual course of business, (3) inadequacy of consideration, (4) retention of control of the property by the transferor after the conveyance, and (5) secrecy, haste, or unusualness of the transaction. Id. Section 278 of the DCL also provides an affirmative defense to a claim of actual fraudulent conveyance. In re Dreier, 452 B.R. 39 at 434. Once the claimant has established a prima facie case of actual fraudulent conveyance, the burden shifts to the transferee to establish the affirmative defense. Id. at 435.

Phillips has demonstrated his entitlement to summary judgment on this claim. It is unnecessary to consider the

Knopfs' prima facie case[16] because Phillips has shown he is entitled to summary judgment on his affirmative defense under § 278(1), as described above.  Phillips' motion for summary judgment on this claim is granted.

## III.   Breach of Fiduciary Duty

The Knopfs move for summary judgment on their claim that Sanford breached his fiduciary duty to the Knopfs as limited partners of the Hedge Fund.  The SAC alleges that Sanford breached his fiduciary duty by, _inter alia_, failing to pay property taxes on the Townhouse; filing an action against the Knopfs in bad faith in 2014; and convincing a reporter to write a negative story about the Knopfs in an effort to injure their reputation.  The Knopfs' summary judgment brief does not address these claims.  Instead, in support of their motion for summary judgment, the Knopfs explain that Sanford breached his fiduciary duty to them when he "failed to cause the proceeds traceable to the Knopfs' $1,690,860 loan to be paid to them when [PHC] was sold on February 1, 2016."

It is undisputed that Delaware law applies to this claim; the Hedge Fund is organized as a Delaware limited partnership.

---

[16]  It should be noted, however, that the Knopfs' assertion of fraud in connection with the sale of PHC focuses on Pursuit's failure to use that $3 million to pay them, not on the lack of fair consideration.  To the extent Pursuit or Sanford defrauded the Knopfs by placing proceeds of the sale beyond their reach, that is a fraud perpetrated by Pursuit and Sanford.

Under Delaware law, "the general partner in a limited partnership owes a fiduciary duty to the limited partners." Boxer v. Husky Oil Co., 429 A.2d 995, 997 (Del. Ch. 1981).

The elements of a breach of fiduciary duty claim under Delaware law are (1) the existence of a fiduciary duty and (2) the defendant's breach of that duty. McKenna v. Singer, 2017 WL 3500241, at *15 (Del. Ch. Jul. 31, 2017). Sanford does not dispute that he acted as the principal of the general partner of the Hedge Fund. It is assumed for purposes of this Opinion, therefore, that Sanford owed the Knopfs a fiduciary duty in connection with the actions of the Hedge Fund.

The Knopfs have not submitted evidence, however, that the sale of PHC was tethered to the activities of the Hedge Fund. While the Knopfs withdrew funds from the Hedge Fund to fund their loans to Sanford and Pursuit, that is the only connection between the Hedge Fund and the purchase of PHC. The documentary evidence reflects that the Knopfs made a loan to Sanford and Pursuit and that Pursuit used that loan to purchase PHC. Therefore, to the extent Sanford was required to use the proceeds from the February 1, 2016 sale of PHC to repay the Knopfs, Sanford was required to do so not as a general partner of the Hedge Fund but pursuant to his February 9, 2006 commitment to Michael Knopf. The Knopfs' motion for summary judgment is denied.

## IV. Alter Ego

The Knopfs also move for summary judgment on their claim for a judgment holding Sanford liable as the alter ego of Pursuit. The forum state's choice of law principles determine which state's law is to be applied to an alter ego claim. Kalb, Voorhis & Co v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993). Under New York choice of law principles, "the law of the state of incorporation determines when the corporate form" will be pierced. Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (citation omitted).

Pursuit is a Delaware limited liability corporation. Therefore, the law of Delaware on piercing the corporate veil of an LLC should be applied.[17] "A plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces a difficult task." NetJets Aviation, Inc. v. LHC Commun., LLC, 537 F.3d 168, 176 (2d Cir. 2008)(citation omitted). Under Delaware law, a court may pierce the corporate veil "where there is fraud or where the corporation is in fact a mere instrumentality or alter ego of its owner." Id. (citation omitted). To prevail, a plaintiff need not prove that there was actual fraud. But, he must demonstrate "a mingling of the

---

[17] The Knopfs rely on Delaware law in their motion papers. Sanford does not dispute that Delaware law applies to this claim.

operations of the entity and its owner plus an overall element

of injustice or unfairness." Id. (citation omitted).

> An alter ego analysis must start with an examination
> of factors which reveal how the corporation operates
> and the particular defendant's relationship to that
> operation.  These factors include whether the
> corporation was adequately capitalized for the
> corporate undertaking; whether the corporation was
> solvent; whether dividends were paid, corporate
> records kept, officers and directors functioned
> properly, and other corporate formalities were
> observed; whether the dominant shareholder siphoned
> corporate funds; and whether, in general, the
> corporation simply functioned as a facade for the
> dominant shareholder.

Id. at 176-77 (citation omitted).  Simply phrased, the standard

may be restated as "whether the two entities operated as a

single economic entity such that it would be inequitable for the

Court to uphold a legal distinction between them."  Id. at 177

(citation omitted).  The Second Circuit has stated this

principle as a two-pronged test "focusing on (1) whether the

entities in question operated as a single economic entity, and

(2) whether there was an overall element of injustice or

unfairness."  Id. (applying Delaware law).

As Sanford has asserted repeatedly in the course of this

and related litigation, and as the other evidence in support of

this motion confirms, Sanford and Pursuit operate for all

practical purposes as a single economic entity.  For instance,

although the Knopfs originally sued Phillips and Pursuit but not

Sanford in this action, at the September 15, 2016 initial

32

conference in this case, Sanford requested that he be added as a defendant because he owned "one hundred percent" of Pursuit and "Pursuit's assets are the same as [his]."

On September 15, 2017, Sanford executed in connection with this litigation an affidavit stating the following:

> Pursuit is a separate company, distinct from me
> personally.  However, I believe for tax-reporting
> purposes Pursuit is considered a disregarded entity.
> I believe Pursuit's income and or capital gains are
> properly filed with my individual tax filings.

On September 22, 2017, Sanford stated during a telephone conference before Magistrate Judge Ronald Ellis in a related case:  "I own Pursuit.  Pursuit was simply established as a separate LLC, a single member LLC, [to hold] title to my personal residential real estate.  There are no other beneficial interest parties.  I am jointly responsible for most if not all of its liabilities."

On October 11, 2017, Sanford requested that this Court stay a related state court action brought against Sanford and Pursuit.  In an affidavit supplied in connection with the motion, Sanford wrote, "[t]he obvious effect of restraining Pursuit's account last week?  I have been severely impeded in paying for and obtaining deposition and other transcripts for

use in my summary judgment defense in Knopf v. Phillips, as well as other Knopf actions."[18] (Emphasis supplied.)

Accordingly, Sanford has conceded that (1) Pursuit's assets "are the same" as his own, (2) Pursuit is a "disregarded" entity for tax-reporting purposes, (3) he uses Pursuit's account to defend himself in this litigation, and (4) he is jointly responsible for most if not all of Pursuit's liabilities. Under these circumstances, failing to acknowledge that Sanford and Pursuit operate as a single entity injects an overall element of unfairness into this litigation.[19]

Sanford's treatment of Pursuit as interchangeable with himself continues to this day. It is reflected in Sanford's affidavits submitted in opposition to the Knopfs' summary judgment motion. Although Pursuit is in default in this action,[20] Sanford styles his second affidavit as a "JOINT AFFIDAVIT of MICHAEL HAYDEN SANFORD, individually; and PURSUIT HOLDINGS (NY), LLC f/k/a PURSUIT HOLDINGS, LLC, by MICHAEL HAYDEN SANFORD." (Emphasis in original.) The affidavit is signed by Sanford individually and as the "authorized

---

[18] In opposition to the Knopfs' summary judgment motion, Sanford contends he misspoke in this affidavit.

[19] It is unnecessary to address the Knopfs' argument that Sanford has abused the corporate form of Pursuit by failing to pay Pursuit's property taxes on the Townhouse, thereby forcing the Knopfs to pay the taxes to avoid foreclosure.

[20] A default was entered against Pursuit on December 2, 2016.

representative" of Pursuit.  In this affidavit, Sanford indicates that the funds he received from the Knopfs were given to him "personally," while the real estate was "exclusively purchased by Pursuit."  As a result, Pursuit "does not owe the Knopfs any equity interest or mortgage on any of its properties."  According to Sanford, the funds that he received from the Knopfs "were not intended to provide [the Knopfs] with any interest whatsoever in the real estate that was exclusively purchased by Pursuit."  These assertions flatly contradict the terms of the agreements described above and reflect Sanford's proclivity to use Pursuit's corporate form to shield himself from personal liability in connection with the loans.[21]

The Knopfs' motion for summary judgment on this claim is granted.  Sanford shall be treated as the alter ego of Pursuit and will be held personally liable for any judgment entered against Pursuit following an inquest.

## V.    Sanford's Affirmative Defenses

The Knopfs move for judgment on the pleadings dismissing Sanford's second, third, and sixteenth affirmative defenses pursuant to Federal Rules of Civil Procedure 12(c) and 9(b).  As

---

[21]  Sanford's argument that the second May 2006 agreement granting the Knopfs and Delphi a 20% interest in the net profits of the Hedge Fund superseded the loan agreements quoted above fails.  That agreement does not reflect any intent to supersede the loan agreements.

described in Sanford's January 9, 2017 answer to the SAC,
Sanford's second affirmative defense asserts that "[t]he
Complaint is barred by Plaintiffs' fraud."  His third
affirmative defense asserts that "[t]he Complaint is barred by
Plaintiffs' fraudulent concealment."  His sixteenth affirmative
defense asserts that "[t]he Complaint is barred by Plaintiffs'
negligent misrepresentations to Sanford."

Based on documents submitted by Sanford in opposition to
the Knopfs' motions for judgment on the pleadings and for
partial summary judgment, it appears that these affirmative
defenses principally involve allegations that counsel for the
Knopfs misled New York state courts by knowingly using false
evidence to obtain an opinion favorable to the Knopfs in the
State Court Action.  Specifically, Sanford appears to allege
that counsel for the Knopfs "made up key numbers" in a chart
submitted to the Appellate Division on appeal and that the
Appellate Division relied on that chart in granting the Knopfs
summary judgment on their breach of contract claims.  See Knopf
v. Sanford, 1 N.Y.S.3d 18.  These allegations do not state an
affirmative defense to the remaining claims against Sanford in
this federal case.  The Knopfs' motion is therefore granted, and
Sanford's second, third, and sixteenth affirmative defenses are
stricken.

## Conclusion

Phillips' October 25, 2017 motion for summary judgment is granted. The Knopfs' October 26, 2017 motion for partial summary judgment is granted to the following extent: Sanford is declared an alter ego of Pursuit. The Knopfs' September 21, 2017 motion for judgment on the pleadings is granted. Sanford's second, third, and sixteenth affirmative defenses are stricken. The claims that remain to be tried against Sanford are: (1) constructive and actual fraudulent conveyance, (2) breach of fiduciary duty, and (3) imposition of a constructive trust. The fraudulent conveyance claim against Pursuit will be referred to the Magistrate Judge for an inquest into damages following the trial of the claims against Sanford.


Dated:    New York, New York
          December 22, 2017

                              _____
                                      DENISE COTE
                              United States District Judge